# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ALFRED K. NIPPERT, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 3:09-cv-1068** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **JAMES R. JACKSON, JR.,** | ) | |
| **individually and d/b/a STONEWALL FARM,** | ) | |
| **JACKSON, DENNEY and DAVIS, INC., and** | ) | |
| **JACKSON PLACE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The origin of this case lies in a series of loans made by the plaintiff, Alfred K. Nippert, Jr. to KCA Enterprises, Inc. ("KCA"), a company formed by the defendant, James R. Jackson ("Jim Jackson"). After obtaining the proceeds from these loans, KCA, which was in the business of selling officially licensed merchandise, generated strong sales revenues but only managed to make one loan payment to the plaintiff. Eventually, the plaintiff brought a lawsuit against KCA in an Ohio federal court and obtained an agreed judgment. KCA, however, did not make any payments in satisfaction of this judgment and instead filed for bankruptcy.

The plaintiff commenced this action on November 6, 2009. He named as defendants: (1) Jim Jackson individually and doing business as Stonewall Farm; (2) Jackson, Denney, and Davis, Inc. ("JDD"), an insurance agency located in Ashland City, Tennessee, which, until January 20, 2010, was controlled by Jim Jackson; and (3) Jackson Place, Inc. ("Jackson Place"), a Tennessee corporation that Jim Jackson controlled until November 30, 2007. One week prior to the

1

commencement of trial, the plaintiff reached a settlement with Mr. Jackson. The plaintiff asserts that the remaining defendants, JDD and Jackson Place, are liable for participating in a civil conspiracy to defraud him. In the alternative, he seeks to pierce the corporate veils of JDD and Jackson Place in reverse, so as to hold them accountable for the actions of their former shareholder, Jim Jackson.

The court conducted a two-day bench trial of this case on November 8-9, 2011. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the court sets forth herein its findings of fact and conclusions of law.

## FINDINGS OF FACT

I. **The Plaintiff's Loans to KCA**

On July 23, 1999, Jim Jackson formed KCA, a company that he named after his three children: Kyle, Chad, and Ashley. (Plaintiff Exhibit 6; Trial Transcript ("Tr.") at 77.) Mr. Jackson was the president of KCA from its inception through its administrative dissolution on August 17, 2009. (Plaintiff Exhibit 6.) At its inception, KCA supplied products to high schools to assist them in various fund-raising campaigns. (Tr. at 77, 241.) From these modest origins, KCA eventually became involved in the business of selling officially licensed collegiate and NASCAR merchandise. (*Id.* at 241.)

The plaintiff, an Ohio resident, but who at the time maintained a law office in Ashland City, Tennessee, met Jim Jackson through a mutual friend, Corky Richard Albright. (Tr. at 240-41.) After getting to know Mr. Jackson and learning about KCA, he decided to make a series of loans to the company. (*Id.*) Thus, from April 18, 2000 to January 10, 2003, the plaintiff loaned a total of $1,696,000 to KCA. (*See* Plaintiff Exhibit 1.) Each loan was memorialized by the

execution of a Demand Promissory Note signed by Jim Jackson, as president of KCA. (*Id.*)

According to the plaintiff, the purpose of these loans was to grow KCA to take its business to the

next level. (Tr. at 241.) Although initially the plaintiff was not a KCA shareholder, he later

obtained a 30% share in KCA's stock. Mr. Jackson remained the majority shareholder,

possessing 51% of KCA's shares,[1] which he owned jointly and equally with his ex-wife, Angela

Jackson.[2] (*Id.* at 91-92, 243; Plaintiff Exhibit 9.)

Once the plaintiff began to loan funds to KCA, the company started to grow and generate

higher sales revenues. (Tr. at 82, 89, 96, 241; Plaintiff Exhibit 14.) Indeed, KCA eventually

moved to a new office, began to supply a broader range of licensed products, and became a

vendor to Wal-Mart. (Tr. at 82, 95, 97, 241.) Despite experiencing this expansion and growth,

KCA made only one loan payment to the plaintiff, in the amount of $100,000, toward the end of

2001. (*Id.* at 107, 243.)

Sometime after he began loaning money to KCA, the plaintiff requested Jim Jackson to

provide him with financial information about the company.[3] (Tr. at 109.) On December 10,

---

[1] Jim Jackson testified that, at its formation, he possessed 91% of KCA's shares of stock, while his three children each possessed 3% of the shares. (Tr. at 91.) Mr. Jackson's ownership interest declined to 81% after Doug Hammond, his brother-in-law at the time, was given a 10% share in KCA's stock when he joined the company. (*Id.* at 91-92.) After the plaintiff obtained a 30% interest, Mr. Jackson's interest in the company declined to 51%. (*Id.*) Although KCA's tax returns reflect that Mr. Jackson owned 75% of KCA's shares of stock, Mr. Jackson testified that the 75% entry was a typographical or other error committed by his accountant and maintained that he never owned that particular percentage of KCA's shares. (Plaintiff Exhibit 14; Tr. at 91-92.)

[2] While Jim and Angela Jackson owned these shares jointly and equally, they were held in Mr. Jackson's name, and he possessed sole voting rights over the stock. (Plaintiff Exhibit 9.)

[3] It is unclear precisely when the plaintiff requested this information. Jim Jackson testified that he submitted balance sheets and income statements for the plaintiff and his attorney and accountant. (Tr. at 109.) He further testified that he offered to provide the plaintiff with any

2002, he obtained a security interest in KCA's equipment, inventory, receivables, and intangibles.  (Plaintiff Exhibit 2.)  The plaintiff also tried, albeit unsuccessfully, to obtain personal guaranties on the KCA loans from both Jim and Angela Jackson.[4]  (Tr. at 175, 180-81, 250.)

Having failed to receive any additional payments from KCA, the plaintiff ultimately brought suit against the company in the United States District Court for the Southern District of Ohio on June 11, 2007, and obtained an agreed judgment in the amount of $2,933,459.17 on November 14, 2008.[5]  (Plaintiff Exhibit 4.)  KCA did not make any payments to the plaintiff in satisfaction of this judgment and, instead, filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee on April 24, 2009.  (Tr. at 111, 252; Plaintiff Exhibit 5.)  The debt at issue in this case was not discharged in bankruptcy.

## II.     JDD and Jackson Place

reports concerning the company's financial status that he wished to see.  (*Id.*) Mr. Jackson also testified that he made a trip to Cincinnati, Ohio to meet with the plaintiff, his attorney, and his accountant each year for two consecutive years, apparently to discuss KCA's financial data. (*Id.*)  After the second year, Mr. Jackson refused to make additional trips because KCA was domiciled in Tennessee.  (*Id.*)

The plaintiff acknowledged that he could have requested Jim Jackson to provide him with reports concerning the company's financial health but that such reports were not meaningful without the underlying raw data concerning KCA's expenditures.  (Tr. at 249.)  This information would have helped the plaintiff's accountant determine how KCA coded its expenses.  (*Id.*)  The plaintiff also testified that Jim Jackson made only one trip to Cincinnati and was accompanied by Doug Hammond.  (*Id.* at 247.)

[4] It is unclear when the plaintiff made this request.

[5] The plaintiff was also awarded attorney's fees and interest at the contractual rate of 10% per year beginning on November 1, 2008.

At the time the plaintiff loaned funds to KCA, Jim Jackson controlled the operations of two other entities: JDD and Jackson Place.  JDD is an insurance agency located in Ashland City, Tennessee and was co-founded by Jim Jackson, Leon Denney, and Faye Davis on May 24, 1988. (Tr. at 74-75; Plaintiff Exhibit 7.)  At the time of its formation, Mr. Jackson possessed a 1/3 ownership interest in JDD, although eventually he obtained sole ownership of the agency.[6]  (Tr. at 75.)  On January 20, 2010, Jim and Angela Jackson entered into an Agreed Order, whereby Mr. Jackson transferred all of his shares of JDD stock to Ms. Jackson to satisfy various financial obligations owed to her pursuant to a prior Marital Dissolution Agreement and Amended Marital Dissolution Agreement.  (Plaintiff Exhibit 9.)  Following the entry of the Agreed Order, Jim Jackson's son, Kyle, who had been previously working as an insurance agent at the agency, became responsible for managing JDD's operations.  (Tr. at 28-29, 32-33.)

Jackson Place was formed on April 17, 1989 and currently owns and operates a commercial building located on Main Street in Ashland City, Tennessee.  (Tr. at 204; Plaintiff Exhibits 8 and 9.)  JDD is a current tenant of Jackson Place and has been at all relevant times.[7] (Tr. at 84; *See* Plaintiff Exhibit 9; Plaintiff Exhibit 31 at 39.)  Initially, Jim and Angela Jackson jointly owned Jackson Place, and each possessed a 50% ownership interest.  (Plaintiff Exhibit 9.) During this time, Mr. Jackson managed the daily operations of the company.  (Tr. at 204; Plaintiff Exhibit 9.)  However, on November 30, 2007, Mr. Jackson transferred his 50% interest

---

[6] Mr. Jackson testified that he did not recall precisely when he became the sole owner of JDD.  (Tr. at 75-76.)

[7] Currently, Jackson Place also has another tenant, Attaboy Automation.  (Tr. at 192.)

in the company to Ms. Jackson, in exchange for the deed to his home and farm located in Ashland City.[8]  (Tr. at 178; Plaintiff Exhibit 9.)

## III.     Jim Jackson's Operation of KCA, JDD, and Jackson Place

### A.     Corporate Formalities

During the time period in which Jim Jackson was in control, KCA, JDD, and Jackson Place failed to observe certain corporate formalities.  For instance, Mr. Jackson issued shares of KCA stock to his three children and to his then brother-in-law[9] for no consideration.  (Tr. at 92.) KCA did not issue stock certificates.  (*Id.* at 97.)  Both KCA and Jackson Place did not have by-laws, and neither held board of directors meetings.[10]  (*Id.* at 94, 97)  JDD also did not have board of directors meetings during the time period in which Jim Jackson possessed sole ownership of the agency, and, while Mr. Jackson testified that JDD did in fact have by-laws, no such document was located after Angela Jackson obtained ownership of the agency in January of 2010.[11]  (*Id.* at 33, 94, 97, 207.)  Moreover, although Mr. Jackson identified officers other than himself in each company's annual filings with the Tennessee Secretary of State, none of these other individuals

---

[8] The terms of this transfer were outlined in an Amended Marital Dissolution Agreement signed by both parties on November 30, 2007.  (Plaintiff Exhibit 9.)

[9] This individual, Doug Hammond, was formerly employed as a marketing representative at KCA.  (Tr. at 91-92.)

[10] Jim Jackson testified that the plaintiff had asked him sometime in either 2000 or 2001 whether KCA had shareholders or board of directors meetings and that he informed the plaintiff that it did not.  (Tr. at 94.)  Mr. Jackson added that, even after the plaintiff raised the issue, KCA still held no board of directors meetings.  (*Id.*)

[11] Angela Jackson testified that by-laws were created for JDD after she obtained ownership of the agency.  (Tr. at 207.)

played any active role in managing the three companies while he was at the helm. (*See* Tr. at 32-33, 96, 204, 206-07; Plaintiff Exhibits 6-8.)

## B. Shared Office Space

In its early years, KCA shared office space with JDD in the building owned by Jackson Place.[12] (Tr. at 84; Plaintiff Exhibit 31 at 12, 16.) While sharing this space, KCA did not pay any rent, and both companies shared the same phone system.[13] (Tr. at 86, 223; Plaintiff Exhibit 31 at 16, 20.) During this time period, KCA and JDD also shared employees. For instance, when she first started, KCA's bookkeeper, Ina Louallen, sat at a receptionist's desk in the front of JDD's office and answered phone calls directed to both KCA and JDD.[14] (Tr. at 86-87, 222-23; Plaintiff Exhibit 31 at 12-14.) There was also a period of time where Kyle Jackson performed work for both KCA and JDD.[15] (Tr. at 27-28; 99-100; Plaintiff Exhibit 31 at 14, 16-17.)[16]

---

[12] On December 8, 2006, KCA and JDD also entered into a lease agreement with Centre 41 Group, Inc. to lease office space in Pleasant View, Tennessee. (Tr. at 101-103; Plaintiff Exhibit 11.) Jim Jackson simply signed the agreement as "President," without identifying which company he was acting on behalf of. (Plaintiff Exhibit 11.) Although JDD was a party to this lease agreement, it never moved to the office space located in Pleasant View. (Tr. at 103.)

[13] KCA's bookkeeper, Ina Louallen, testified by deposition that she believed that JDD possessed a server that connected her computer, which was used for KCA business, with JDD's other computers. (Plaintiff Exhibit 31 at 20.) Kera Baker, a former JDD insurance agent and bookkeeper, testified that JDD's computers were networked, although she believed that Ms. Louallen's computer was a stand-alone. (Tr. at 223-24.)

[14] Kera Baker also performed some part-time work for KCA, although she did so after it had moved into its own office space. (Tr. at 101; 223.)

[15] At trial, Jim Jackson was asked whether KCA paid Kyle Jackson's compensation during the time he worked at JDD. (Tr. at 100.) He responded that if Kyle Jackson worked for KCA, he was paid by KCA, and if he worked for JDD, he was paid by JDD. (*Id.*) Jim Jackson added, however, that none of his companies kept time records for its employees. (*Id.*)

[16] Also during this time period, KCA shared the same certified public accountant, Judson Scott, with Jackson Place. (Tr. at 89-90, 205; Plaintiff Exhibits 14, 16.) Mr. Scott also

## C.     Transfers of KCA Funds

While Jim Jackson controlled KCA, the company paid for his and his family members' personal expenses.  It also transferred funds to both JDD and Jackson Place.  Some of these funds transfers were made during the time period when the plaintiff was making his loans to KCA, and all of them were made at Jim Jackson's sole discretion.[17]  (Tr. at 126.)

Jim Jackson caused KCA to make payments for a variety of personal expenses.  For instance, KCA made car payments for Angela Jackson's BMW convertible and paid her personal cell phone bills.  (Tr. at 119-120; Plaintiff Exhibit 29; Plaintiff Exhibit 31 at 84-85.)  KCA also paid for Mr. Jackson's 2006 Dodge Ram and for services performed by individuals who worked at his horse farm.[18]  (Tr. at 118; Plaintiff Exhibit 30 at 116.)

_____

performed personal accounting work for Jim Jackson.  (*Id.* at 90.)  Tom Harris was another CPA who worked for both Jim Jackson and JDD.  (*Id.* at 90; Plaintiff Exhibit 15.)

[17] KCA also made various wire transfers totaling $1,405,602 to unknown payees between August 27, 2002 and December 10, 2002.  (Tr. at 122; Plaintiff Exhibit 29.)  However, two of those wire transfers were marked as payments to the Sourcing Department, a supplier of KCA.  (*Id.*)  Jim Jackson testified that, based on their size, the remaining wire transfers would have also constituted payments to the Sourcing Department for product.  (Tr. at 122.)  Apart from Mr. Jackson's testimony, there is no other evidence concerning precisely what these remaining wire transfers constitute.  KCA also made a wire transfer of $100,010 to an AmSouth Bank account on January 13, 2003.  (Tr. at 123; Plaintiff Exhibit 29.)  Mr. Jackson testified that KCA did hold an account with AmSouth at one time, but he did not know the specific purpose behind this wire transfer.  (Tr. at 121, 123.)  There is no other evidence shedding light on the purpose of this transfer.

[18] KCA also made payments for other seemingly personal expenses.  For instance, while KCA paid for loads of hay, Jim Jackson testified that such payments would have been in exchange for the hay provider allowing KCA to use its equipment to haul product to the company's printer.  (Tr. at 120.)  In addition, while KCA paid for a trip to the Nantahala Mountain Resort, Jim Jackson asserted that the trip had a business purpose, as he met with KCA's sales representatives.  (*Id.* at 119.)

During the course of its existence, KCA also wrote $77,835 in checks to JDD. (Tr. at 126; Plaintiff Exhibit 29.) The memo lines of the checks show that a sizable portion of these funds constituted loans by KCA to JDD or repayments by KCA of loans previously made by JDD.[19] (Plaintiff Exhibit 29.) Jim Jackson was unable to explain the circumstances surrounding those particular transfers and testified that Ina Louallen was better suited to offer an explanation. (Tr. at 117-18.) He added, however, that JDD repaid any loans that it received from KCA. (*Id.* at 118.) Ms. Louallen testified by deposition that KCA and JDD loaned money to one another for operating expenses.[20] (Plaintiff Ex. 31 at 35-36.) She also testified that KCA had received repayments from JDD for any funds it had loaned to the agency. (*Id.* at 38, 124.) Kera Baker, a former JDD insurance agent and bookkeeper, did not recall KCA making loans to JDD while she was a bookkeeper, although she did remember processing checks written by KCA to JDD. (Tr. at 222, 224-25, 231.) Ms. Baker also did not remember whether KCA covered any shortfalls in JDD's income. (*Id.* at 225.)

As for the remaining checks written by KCA to JDD, many appeared to be reimbursements for various office expenses, including shipping and postage charges, phone and fax charges, and office supplies. (Plaintiff Exhibit 29.) Others appeared to be insurance

_____

[19] The details concerning the checks written by KCA to JDD and Jackson Place are contained in Exhibit 8 of the Expert Witness Disclosure Statement of Glenn W. Perdue, the plaintiff's expert witness. (Plaintiff Exhibit 29.) Exhibit 8 provides detailed information concerning checks written by KCA between 1999 and 2009 and includes, among other things: (1) the year the check was written; (2) the payee; (3) the description contained on the memo line, if any; and (4) the amount of the check. (*Id.*)

[20] She added that she was not aware of the loans being evidenced by any documentation, such as a promissory note. (Tr. at 36.)

payments, bill payments, and reimbursements for American Express charges.[21] (*Id.*) Finally, a substantial number of checks contained a blank memo line. (*Id.*) As to these particular checks, neither party has produced any evidence explaining their purpose.

Beginning in 2005, KCA also wrote checks to Jackson Place that ultimately totaled $53,632. These checks constituted repayments of a loan Jackson Place made to KCA. On January 29, 2003, Jackson Place obtained first and second mortgages on the building it owned in Ashland City. (Defendant Exhibit 1.) One of these mortgages was for $150,000, the proceeds of which Jackson Place then loaned to KCA, so that KCA could make a payment to its supplier. (Tr. at 213, 216-17, 379.) In 2005, while Angela and Jim Jackson were in the midst of finalizing their divorce, both mortgages were combined and refinanced. (*Id.* at 219, 379.) Angela Jackson testified that she believed that KCA was making payments on the $150,000 mortgage directly to the bank before the refinancing. (*Id.* at 379-81.) However, once the mortgages were refinanced, KCA began to make monthly payments to Jackson Place for the note held by the bank.[22] (*Id.*) The Amended Marital Dissolution Agreement entered into between Angela and Jim Jackson noted that the amount of these payments was $1,339.31 per month. (Plaintiff Exhibit 9.) Similarly, each of the checks written by KCA to Jackson Place was for either $1,339 or $2,679 (which is roughly $1,339.31 multiplied by two). (Plaintiff Exhibit 29.)

## IV.    JDD Stock Transfer

---

[21] In addition, one check simply contains the description "Ref: 8228" on its memo line, while another states that it is some form of reimbursement. (Plaintiff Exhibit 29.) None of the evidence offered at trial shed any further light on these payments.

[22] Angela Jackson testified that KCA began making payments to Jackson Place because she wanted to ensure that KCA would continue to make payments on the $150,000 mortgage after the refinancing, and she was afraid that KCA would go into default if it continued to make loan payments directly to the bank. (Tr. at 381.)

Just over two months after the plaintiff filed the instant action, Jim and Angela Jackson signed an Agreed Order, whereby Mr. Jackson agreed to transfer all of his shares in JDD stock to his ex-wife in satisfaction of certain financial obligations he had incurred pursuant to the parties' Marital Dissolution Agreement and Amended Marital Dissolution Agreement. (Plaintiff Exhibit 9.) The sum of these obligations totaled $358,299.25. (*Id.*) For her part, Angela Jackson agreed to accept all of her ex-husband's shares of JDD stock in full satisfaction of those financial obligations and acknowledged that the value of the JDD stock was impaired by the debts and liabilities of the agency. (*Id.*)

During the time period leading up to the entry of the Agreed Order, there was a pending state court contempt petition brought by Ms. Jackson arising out of Mr. Jackson's failure to comply with the aforementioned financial obligations, which included alimony and monthly rental payments by JDD to Jackson Place. (Tr. at 172, 174, 178-79, 191-92, 382-83.) Ms. Jackson brought the contempt petition because she was concerned that she was not going to be able to make her monthly mortgage payments on the Jackson Place building. (*Id.* at 191-92.)

Toward the end of 2009, while this petition was still pending, Ms. Jackson began to talk to her attorney at the time, Dan Huffstutter, about the possibility of obtaining JDD's stock. (Tr. at 194-95.) She testified that she sought JDD's shares because she believed it would help her keep the Jackson Place building and also preserve JDD for Kyle Jackson.[23] (*Id.* at 196, 200.) She added that she hoped that her son would be able to turn around the agency. (*Id.* at 391.)

---

[23] As previously noted, JDD was delinquent in making its rent payments to Jackson Place, which, according to Angela Jackson, impaired her ability to make Jackson Place's monthly mortgage payments. (Tr. at 192, 387.)

Before being presented with the Agreed Order, Jim Jackson contemplated selling his shares in JDD to his son, Kyle Jackson. (Plaintiff Exhibit 24.) On December 1, 2009, Mr. Jackson e-mailed Bob Harlan, an attorney who had previously represented KCA in its bankruptcy case, to ask some questions in light of the plaintiff's recently filed civil suit. (*Id.*) In particular, Mr. Jackson revealed that he was nearly insolvent and asked whether filing a bankruptcy petition pursuant to Chapter 7 of the United States Bankruptcy Code would relieve him of any potential exposure from the plaintiff's suit. (*Id.*) In addition, he asked whether selling JDD to his son would be prohibited if he received a legitimate value for the sale. (*Id.*) As to this latter question, Mr. Harlan advised that "[i]t is not a good idea to transfer assets before a bankruptcy because it gives the appearance the asset has value and you are putting that value out of reach of the creditors. Even if that is not true, it is hard to dispel that appearance." (*Id.*)

Within a couple of weeks of this email exchange, Mr. Huffstutter, JDD and Jackson Place's current counsel held a meeting at Mr. Huffstutter's office with both Jim and Kyle Jackson where Mr. Huffstutter presented them with a draft of the Agreed Order and explained its contents.[24] (Tr. at 139.) After being presented with the draft of the Agreed Order, Jim Jackson did not immediately agree to its terms, but instead considered its ramifications, which would essentially leave him with nothing but his farm. (Tr. at 139; Plaintiff Exhibit 25.) In doing so, he sent emails to Mr. Huffstutter seeking additional information about the proposed stock transfer, discussed the transaction with Kyle Jackson, and tried to follow-up with Mr. Harlan. (Tr. at 140-43; Plaintiff Exhibits 24-26.)

_____

[24] Jim Jackson testified that this was the only in-person meeting he held with Mr. Huffstutter concerning the Agreed Order. (Tr. at 145.)

On December 16, 2009, Jim Jackson emailed Mr. Huffstutter, as well as his own attorney, David Wolf, primarily to express that he required additional time to fully understand the implications of the proposed stock transfer. (Plaintiff Exhibit 25.) Mr. Huffstutter responded that same day and expressed his concern that time was running out for Mr. Jackson to transfer his JDD shares. (*Id.*) He added that the Agreed Order appeared to be what was in the best interests of Kyle Jackson. (*Id.*) The next day, Jim Jackson wrote back to Mr. Huffstutter, acknowledging that, even with their disagreements, both he and Angela Jackson "would agree that to preserve Kyle's future is paramount at whatever the cost." (*Id.*) In addition, he asked Mr. Huffstutter, among other things, about the potential impact of the proposed Agreed Order on what the plaintiff may do to him and his farm. (*Id.*) Mr. Huffstutter replied almost one week later and again stated that time was slipping away on the stock transfer being an available option.[25] (*Id.*)

On December 29, 2009, Mr. Huffstutter responded via email to a series of questions posed by Jim Jackson concerning the Agreed Order.[26] (Plaintiff Exhibit 25.) Mr. Huffstutter addressed the value of the consideration Mr. Jackson would receive from Ms. Jackson in exchange for his transfer of JDD shares and stated the following: "I do not agree as to value, but I do anticipate Nippert will take the position that it was a fraudulent transfer for less than full consideration so as to acquire the agency from you or your control. I do expect [sic] will be a

---

[25] It was not made clear during trial as to precisely what created the urgency referenced in Mr. Huffstutter's emails, whether it was Ms. Jackson's pending contempt petition, the plaintiff's lawsuit, or something else.

[26] As part of his settlement with the plaintiff, Jim Jackson agreed to produce emails in his possession concerning the transfer of all of his JDD stock to Angela Jackson. (Tr. at 170, 259-60.) However, there were gaps in the emails produced. One of these gaps is the email from Mr. Jackson to Mr. Huffstutter containing the actual questions that Mr. Huffstutter responded to on December 29, 2009. (*See* Plaintiff Exhibit 25.)

fight with Nippert which could be lost." (*Id.*)  He concluded his email by offering a number of opinions concerning the Agreed Order:

> I personally think [the Agreed Order] should be done effective as of 1/1/10.  If all i's are dotted and t's crossed and assuming the best luck, I still think this has less than a 50% success potential.  However, your continuing to be the driving force[,] I put the chances of success at 0.  This is the only plan that I see that has any hope of salvaging something.
>
> I know that you have read that complaint and I can assure you Al Nippert is not concerned about $$, this is personal, very personal and that is the wors[t] of all positions for a defendant with a rich plaintiff.  My guess is he will not stop until he breaks you which will include JDD if he believes you have any involvement.  I am hoping that is limited to you and does not spill over to Kyle.  I think you have very, very few options and limited time before there are no options.  Sorry to ramble, but I a[m] concerned that you do not truly appreciate the gravity of the situation and the potential consequences.

(*Id.*)

The next day, Mr. Huffstutter responded to an email from Jim Jackson recounting a hostile conversation Mr. Jackson had with his ex-wife concerning JDD's inability to pay its rent to Jackson Place.  (Plaintiff Exhibit 25.)  In that email, Mr. Jackson stated that the conversation with his ex-wife left him not wanting to take any action that may benefit her.  (*Id.*)  After explaining that Angela Jackson had to receive, among other things, timely rent payments from JDD in order for her to carry the note on the building, Mr. Huffstutter stated that Ms. Jackson would have already evicted JDD, had it not been for the prospect of Kyle Jackson being placed in a position to continue JDD, subject to getting past the plaintiff's claims.  (*Id.*)  He added that the Agreed Order represented the only slim hope of preserving JDD for Kyle Jackson, which was getting slimmer with each passing day.  (*Id.*)  According to Mr. Huffstutter, Jim Jackson's actions

were central to determining JDD's future prospects, which he stated were very grim, given the plaintiff's lawsuit.  (*Id.*)  Mr. Huffstutter concluded the email with the following statements:

> Trying to protect your assets from Mr. Nippert will probably prove in vain, but there is no downside in trying.  It appeared to me, that solving many of the divorce issues and, at the same time, trying to protect Kyle would have been a good move in a very complex Labyrinth being eyed by a fierce dragon.

(*Id.*)

As previously noted, Jim Jackson also discussed the Agreed Order with his son, Kyle Jackson.  (Tr. at 35, 142-43.)  Kyle Jackson believed that the Agreed Order would give him an opportunity to run the agency and attempt to save it from its financial struggles.  (*Id.* at 36.)  At the time, he was concerned that he was not going to have a job at JDD, given the way things were going at the agency.  (*Id.* at 65.)  He testified that, "for my own purpose[,] I wanted to run the company[,] because it wasn't going to be around much longer."  (Tr. at 36.)  He added that "my only objective . . . was to save that company for myself and my four children.  That's it."  (*Id.* at 37-38.)  He also believed that the Agreed Order would help JDD avoid any potential fallout from the lawsuit filed by the plaintiff.  (*Id.* at 40-41.)  Thus, he attempted to persuade his father to sign the Agreed Order.  (*Id.* at 42.)  These attempts are captured in a series of emails exchanged between Kyle and Jim Jackson during the early part of January 2010.

For instance, on January 5, 2010, Kyle Jackson emailed his father to inform him that he spoke with Angela Jackson and Mr. Huffstutter about the Agreed Order.  (Plaintiff Exhibit 26.)  Among other things,[27] he stated to his father that the Agreed Order was trying to avoid the

---

[27] For instance, Kyle Jackson informed his father that, despite his best efforts, Angela Jackson would not agree to forgive future alimony payments as part of the terms of the Agreed Order.  (Plaintiff Exhibit 26.)

plaintiff and any judgment he may obtain against JDD.[28]  (*Id.*)  He also stated that the Agreed

Order was a last ditch effort to salvage JDD and that, according to Mr. Huffstutter, provided no

guarantee in accomplishing that purpose.  (*Id.*)  In referring to a potential transition period that

would occur if the Agreed Order was signed, Kyle Jackson wrote that "now with a judgment

looming[,] and per Dan[,] could come down any day[,] there can be no ties at all once it is done."

(*Id.*)  When asked at trial about this quoted language, Kyle Jackson testified that he referred to a

looming judgment because he wanted to get the stock transfer done "for [his] own selfish

reasons," and that Mr. Huffstutter did not, to his knowledge, advise him that a judgment could be

entered against JDD any day.  (Tr. at 42.)  He also added: "[t]hat was probably me just trying to

persuade my father to be done with my mom and the marriage and all the money he owed her and

for me to take the company forward."  (*Id.*)

Three days later, on January 8, 2010, Kyle Jackson emailed his father to recount another

conversation he had with Mr. Huffstutter and wrote that, according to Mr. Huffstutter, a

judgment would constitute "the end of JDD," and the plaintiff would be able to seize and sell any

of JDD's assets.  (Plaintiff Exhibit 26.)  He also noted how Mr. Huffstutter kept repeating that

the chances of the Agreed Order working were diminishing each day.  (*Id.*)  Kyle Jackson also

noted to his father that, in his opinion, "Al [Nippert] only wants you[,] not JDD."  (*Id.*)  He

added that, if his father ceased to own JDD, the agency could "live to fight another [b]attle[,]

which is coming up with the . . . money to save it."  (*Id.*)

---

[28] Kyle Jackson testified that, from his point of view, the Agreed Order was trying to
prevent his father from continuing to run JDD, since it would not last much longer in light of the
money he owed Angela Jackson for certain marital obligations incurred as a result of his divorce.
(Tr. at 40.)  However, he later added that the Agreed Order was also attempting to avoid any
fallout from the plaintiff's lawsuit.  (*Id.* at 40-41.)

Jim Jackson responded the next day and remarked that the points Mr. Huffstutter made to Kyle Jackson essentially rehashed what was said to both of them at the prior meeting held at Mr. Huffstutter's office. (Plaintiff Exhibit 26.) While he did not know whether to believe Mr. Huffstutter, Jim Jackson stated that, for the sake of the agency and its employees' job security, it was not worth it for him to continue on at JDD. (*Id.*) He told his son that he was relying on him to get him through the transition, so that he could avoid declaring bankruptcy for as long as possible. (*Id.*) At the end of his email, Jim Jackson told his son to get him to a comfort zone, so that he could sign the Agreed Order. (*Id.*)

Before agreeing to transfer his shares of JDD stock, Jim Jackson emailed Mr. Harlan and asked him about the impact of the plaintiff getting a judgment against JDD. (Plaintiff Exhibit 24.) Among other things, Jim Jackson asked whether the plaintiff would be able to sell the agency, even if Mr. Jackson still owned all of its shares. (*Id.*) He also informed Mr. Harlan of the proposed Agreed Order and outlined its basic terms.[29] (*Id.*)

On the following day, Jim and Angela Jackson signed the Agreed Order. At trial, Mr. Jackson testified that he agreed to the stock transfer to settle the pending issues in his divorce and to preserve JDD for Kyle Jackson. (Tr. at 160-61.) Following the entry of the Agreed Order, Kyle Jackson assumed management responsibilities over JDD. (*Id.* at 32.) On August 18, 2010, almost seven months after transferring his JDD shares, Jim Jackson filed a voluntary petition

---

[29] In his response email, Mr. Harlan did not address any of the substantive questions raised by Mr. Jackson, but instead expressed his reservations about taking the case without knowing how much attorney time it would involve. (Plaintiff Exhibit 24.)

under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee.[30]  (Plaintiff Exhibit 10; Tr. 164-65.)

As some of the previous emails indicated, JDD was experiencing financial difficulties during the time frame when Jim and Angela Jackson were considering the Agreed Order.  (Tr. at 36, 140-41, 198.)  The agency was in debt in the amount of approximately $80,000 and was out of trust with several of its insurance providers.[31]  (*Id.* at 41, 62.)  JDD had also fallen behind on its rent payments to Jackson Place and was running out of cash.  (*Id.* at 62, 174, 192.)  In light of these difficulties, Kyle Jackson and his wife personally borrowed $45,000 after the entry of the Agreed Order to help JDD pay off its debts.[32]  (*Id.* at 41, 63.)

## V.     Settlement with Jim Jackson

On November 1, 2011, one week before the beginning of this bench trial, the plaintiff signed a Settlement Agreement with Jim Jackson.  (Plaintiff Exhibit 27.)  Pursuant to the agreement's terms, the plaintiff dismissed his claims in this lawsuit against Mr. Jackson with prejudice.  (*Id.*)  Jim Jackson also agreed to stipulate to a Judgment and Order of

---

[30] Mr. Jackson previously filed a Chapter 13 petition, but he decided to voluntarily dismiss it and instead file under Chapter 11.  (Tr. at 164)  The Chapter 11 case is docketed as case number 3:10-bk-08723.

[31] Kyle Jackson explained that an agency is out of trust when it is past due on paying premiums to its insurance brokers and added that being out of trust creates a significant problem for an agency.  (Tr. at 62-63.)

[32] At trial, the court heard additional testimony regarding the amount of JDD's assets and the overall value of the agency.  As to this latter issue, the court heard testimony concerning how: (1) Angela and Jim Jackson valued the agency in 2005, during their divorce, and in 2010, when they entered into the Agreed Order; and (2) the plaintiff's expert witness, Mr. Perdue, arrived at his figures concerning the agency's value at the time Jim and Angela Jackson entered into the Agreed Order.  In light of the conclusions of law discussed herein, *see infra* pp. 29-32, the court need not make factual findings regarding these issues.

Nondischargeability in the amount of $750,000 pursuant to 11 U.S.C. § 523(a)(6), which was entered in the Adversary Proceeding of his bankruptcy case on November 3, 2011.[33] (Plaintiff Exhibits 27, 28.) In addition, the Settlement Agreement granted the plaintiff an allowed claim of $3,449,428.15 in Mr. Jackson's bankruptcy case. (*Id.*) Finally, Mr. Jackson agreed to waive the protections afforded by the attorney-client privilege and work-product doctrines and produce certain emails to the plaintiff, including those that contained discussions regarding the proposed Agreed Order. (Plaintiff Exhibit 27.) In waiving these protections, Mr. Jackson represented that he was the president and sole officer of JDD from the late-1990s until January 20, 2010. (*Id.*)


## CONCLUSIONS OF LAW

The plaintiff contends that JDD and Jackson Place are liable for participating in a civil conspiracy to defraud him. Alternatively, he argues that the court should pierce the corporate veils of JDD and Jackson Place in reverse, so as to hold them accountable for the actions of their former shareholder, Jim Jackson. The court will address each of the plaintiff's claims in turn.

### I.     Civil Conspiracy

The plaintiff argues that JDD and Jackson Place were participants in two different conspiracies to defraud him. First, the plaintiff contends that KCA, JDD, and Jackson Place conspired, each through their agent Jim Jackson, to have KCA transfer $131,467 in funds to JDD and Jackson Place. He also contends that JDD conspired with Angela and Jim Jackson, through

---

[33] 11 U.S.C. § 523(a)(6) provides that an individual debtor will not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

its employee Kyle Jackson, to create the transaction through which Jim Jackson transferred his JDD shares to Ms. Jackson in an attempt to avoid a judgment by the plaintiff against the agency.

A civil conspiracy requires "a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). Stated differently, the elements of a civil conspiracy claim are: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006). If a conspiracy is found, "each conspirator is liable for the damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme. *Trau-Med*, 71 S.W.3d at 703. In Tennessee, it is well-established that a corporation is capable of extra-corporate conspiracy, whereby it becomes vicariously liable for the acts of its agents who conspire with other corporations or outside third parties. *Id*.

However, participation in a civil conspiracy is not, by itself, an actionable tort. *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 WL 2827498, at *7 (Tenn. Ct. App. Sept. 27, 2007). Rather, a civil conspiracy claim requires "the existence of an underlying tort or wrongful act committed by one or more of the conspirators in furtherance of the conspiracy." *Id. (citing Forrester v. Stockstill*, 868 S.W.2d 328, 330 (Tenn. 1994); *Tenn. Publ'g Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932); *Levy v. Franks*, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004)). Here, the plaintiff argues that the transactions underlying each of the conspiracies constituted

fraudulent conveyances under Tennessee's Uniform Fraudulent Transfer Act ("UFTA"), Tenn.

Code Ann. § 66-3-301, *et seq*. In particular, he argues that the aforementioned transactions

violate sections 66-3-305(a)(1) and 66-3-306(a) and (b) of the UFTA.

Section 66-3-305(a)(1) of the UFTA provides, in pertinent part, that "[a] transfer made . .

. by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the

transfer was made . . . , if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or

defraud any creditor of the debtor." Tenn. Code Ann. § 66-3-305(a)(1) (2004). In determining

whether there is actual intent, a court may consider, among other factors, whether:

> (1) The transfer . . . was to an insider;
> (2) The debtor retained possession or control of the property transferred after the transfer;
> (3) The transfer . . . was disclosed or concealed;
> (4) Before the transfer was made . . . , the debtor had been sued or threatened with suit;
> (5) The transfer was of substantially all the debtor's assets;
> (6) The debtor absconded;
> (7) The debtor removed or concealed assets;
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made . . . ;
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305(b) (2004).

Section 66-3-306 outlines the circumstances under which a transfer shall be deemed

fraudulent and provides that:

> (a) A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value

in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tenn. Code Ann. § 66-3-306 (2004).  Thus, this section addresses constructive fraud.  Unlike cases involving actual fraud, a finding of intent is not required in order to conclude that a particular transaction is fraudulent under this section.

The plaintiff claims that a violation of section 66-3-306 can form the underlying basis for his civil conspiracy claim.  Thus, he is essentially arguing that JDD and Jackson Place can be held liable for conspiring to commit constructive fraud.  Yet, a civil conspiracy requires that the alleged conspirators possess the specific intent to commit an unlawful act or a lawful act by unlawful means.  Since constructive fraud requires no intent to deceive, the court fails to see how a person can conspire to commit constructive fraud.  While no Tennessee court has decided the issue, one has remarked that "some states have held that conspiracy to commit constructive fraud is a legal impossibility because one cannot conspire to commit a[n] [act] for which he does not have the intent [to commit.]"  *Kincaid*, 221 S.W.3d at 39 n.8 (concluding that it was unnecessary to reach the issue of whether the plaintiff's conspiracy to commit constructive fraud claim was a legal impossibility because it was deficient for other reasons).  One of the cases cited in *Kincaid, Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996), concluded that an individual could not conspire to be negligent, "[b]ecause negligence by definition is not an intentional wrong[,]" and a "civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."  *Id.* (quotation marks and citations omitted).

The court finds that this reasoning is equally applicable in the context of constructive fraud. Accordingly, the court concludes that a violation of section 66-3-306 cannot form the underlying basis for the plaintiff's civil conspiracy claim.

The court is thus left with the task of determining whether JDD and Jackson Place can be held liable for participating in a conspiracy to actually defraud the plaintiff under section 66-3-305(a)(1) of the UFTA. Again, the plaintiff has identified two different types of transfers that he claims are fraudulent under this section. The first category consists of numerous funds transfers from KCA to both JDD and Jackson Place totaling $131,467. The second category consists of a single transfer, that is, Jim Jackson's transfer of JDD shares to Angela Jackson pursuant to the Agreed Order entered on January 20, 2010.

### A.    KCA's Funds Transfers

#### 1)    JDD

At the sole discretion of its president, Jim Jackson, KCA wrote checks totaling $77,835 to JDD, an entity which Mr. Jackson controlled until he signed the Agreed Order. The plaintiff claims, albeit without much elaboration, that all of these funds transfers were made in furtherance of an overarching scheme devised by Jim Jackson, as the president of KCA, JDD, and Jackson Place, to defraud him, a creditor of KCA.[34] However, the plaintiff's civil conspiracy

---

[34] The UFTA defines a "[c]reditor" as "a person who has a claim." Tenn. Code Ann. § 66-3-302(4) (2004). Likewise, a "[c]laim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Tenn. Code Ann. § 66-3-302(3)

claim must fail, because the evidence in the record does not establish that any of these transfers was fraudulent.

KCA began writing checks to JDD in 1999, before the plaintiff even made his first loan, and continued doing so until sometime in 2008. The memo lines on the checks show that a substantial portion of these funds constituted either KCA loans to JDD or repayments by KCA of funds previously loaned by JDD. Although Jim Jackson was unable to explain the precise circumstances surrounding those particular transfers, he believed that JDD repaid any loans that it received. He also added that KCA's former bookkeeper, Ina Louallen, was better suited to offer an explanation for the transfers. Ms. Louallen testified by deposition that KCA and JDD loaned each other funds to cover operating expenses and that KCA received repayments from JDD for any funds it loaned.[35] Another substantial portion of the checks appears to have been reimbursements for various office expenses and American Express charges, insurance payments, and bill payments. Finally, the remaining checks contained blank memo lines, and neither party offered any evidence at trial shedding any light on their purpose. While it is conceivable that these checks constituted fraudulent transfers, it is just as likely, if not more likely, given the evidence offered at trial concerning the other funds transfers to JDD, that these checks constituted payments for business expenses or other innocent activities.

In advancing his claim, the plaintiff has made no attempt to explain how any of the 46 checks written by KCA to JDD over the span of approximately 8 years each constituted a

---

(2004). As the plaintiff possesses a judgment against KCA, he is plainly a "[c]reditor" for purposes of the statute. Likewise, KCA is a "[d]ebtor" under the statute because it is liable on a claim. *See* Tenn. Code Ann. § 66-3-204(6).

[35] While JDD's former bookkeeper, Kera Baker, did not recall KCA making such loans, her lack of recollection as to this issue does not controvert Ms. Louallen's testimony.

fraudulent transfer.  Instead, he simply argues that all of these individual transfers, taken in the aggregate, were made with an actual intent to defraud him.  This is confirmed by the testimony of his expert, Glenn W. Perdue, who testified that, in arriving at the $77,835 figure, he simply added together all of the checks written by KCA to JDD without reviewing the descriptions on each check's memo line.  (Tr. at 341-42.)  In addition, with the exception of arguing that all of KCA's transfers were made to an insider (JDD),[36] the plaintiff has failed to show how each of these transfers triggers any of the factors that may be considered in determining actual intent under section 66-3-305(a).  However, even with the existence of at least one such factor, the court finds that the evidence preponderates against a finding that these transfers were made with the actual intent to defraud the plaintiff.  Indeed, given the evidence offered at trial concerning these checks, it appears more likely than not that these transfers were made by KCA to JDD for a whole host of business reasons.[37]  Thus, the court finds that the transfers made by KCA to JDD were not fraudulent under section 66-3-305(a)(1) of the UFTA.[38]

---

[36] Under the UFTA, an "[i]nsider" includes an "[a]ffiliate."  Tenn. Code Ann. § 66-3-302(7)(D) (2004).  In turn, an "affiliate" includes "[a] corporation twenty percent (20%) or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, by . . . a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent (20%) or more of the outstanding voting securities of the debtor."  Tenn. Code Ann. § 66-3-302(1)(B) (2004).  JDD was thus an "[i]nsider" under the statute, since all of its outstanding shares were held by Jim Jackson, an individual who also owned more than 20% of KCA's (i.e., the debtor's) outstanding shares of stock.

[37] The plaintiff argues that he could not verify whether the transfers from KCA to JDD were legitimate payments because Jim Jackson allegedly destroyed the KCA documents concerning these transfers.  Mr. Jackson, however, is no longer a defendant in this lawsuit, as the plaintiff has settled his claims against him.  The plaintiff has not otherwise claimed that Mr. Jackson destroyed any KCA documents while acting on behalf of JDD or Jackson Place, or as part of a conspiracy with JDD and Jackson Place to defraud him.

[38] Under the UFTA, the plaintiff has the burden to establish that a particular transaction constitutes a fraudulent transfer.  *See* Tenn. Code Ann. § 66-3-305, comment 5 ("Proof of the

### 2) Jackson Place

Beginning in 2005, Jim Jackson also caused KCA to write checks to Jackson Place that totaled $53,632.  Again, without offering many details, the plaintiff claims that each of these funds transfers was made in furtherance of a conspiracy between KCA, JDD, and Jackson Place to defraud him.  Because the evidence in the record does not establish that any of these transfers was fraudulent, the plaintiff's civil conspiracy claim as to these transfers must also fail.

Here again, with the exception of arguing that all of the transfers were made to an insider[39] (Jackson Place), the plaintiff has failed to show how each of these transfers implicates any of the other factors considered in determining actual intent under the UFTA.  Nonetheless,

_____

existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer."); *Hickman v. Turitto*, No. 1:06-cv-151, 2007 WL 2892788, at *3-7 (E.D. Tenn. Sept. 28, 2007) (discussing the history of Tennessee fraudulent conveyance law and concluding that, under the UFTA, the plaintiff retains the burden of proving fraud).

However, the effective date of the UFTA was July 1, 2003, and many of the transfers from KCA to JDD were made prior to that date.  The statutory scheme in place prior to the UFTA's enactment incorporated a burden-shifting framework applied by courts at common law.  *Hickman*, 2007 WL 2892788, at * 3-4.  Under that framework, the presence of one or more "badges of fraud" raised a presumption of fraud and shifted the burden of disproving fraud to the defendant.  *Nadler v. Mountain Valley Chapel Bus. Trust*, No. E2003-00848-COA-R3-CV, 2004 WL 1488544, at *2 (Tenn. Ct. App. June 30, 2004).

Yet, even applying this framework here, the court's conclusion would remain the same.  Here again, with the exception of arguing that all of the transfers were made to an insider, the plaintiff has failed to show how each transfer from KCA to JDD triggered any other badges of fraud.  *See Nadler*, 2004 WL 1488544, at *2 (noting that, when "[a] family or friendship relationship exist[s] between the transferor and the transferee," it constitutes a badge of fraud).  However, despite the presence of at least one badge of fraud surrounding these transactions, JDD has shown that the transfers made to it by KCA were not fraudulent.

[39] Jackson Place is an "insider" under the UFTA, since at all times 20% or more of its outstanding shares of stock was held by Angela Jackson, an individual who also owned more than 20% of KCA's (the debtor's) outstanding shares of stock.  *See* Tenn. Code Ann. § 66-3-302(1)(B), -3-302(7)(D) (2004).

even though Jackson Place was an insider, there is ample evidence establishing that each of the checks written by KCA to Jackson Place constituted repayments of a loan Jackson Place previously made to KCA. Indeed, the evidence shows that, on January 29, 2003, Jackson Place obtained first and second mortgages on the building it owned in Ashland City. One of those mortgages was for $150,000, the proceeds of which Jackson Place then loaned to KCA, so that KCA could make a payment to its supplier. After Angela and Jim Jackson refinanced both of the mortgages in 2005, KCA began making monthly payments to Jackson Place on the note held by the bank. The Amended Marital Dissolution Agreement entered into between Angela and Jim Jackson reflected that these payments equaled $1,339.31 per month. Likewise, each of the checks written by KCA to Jackson Place beginning in 2005 was for either $1,339 or $2,679 (which is roughly $1,339.31 multiplied by two).

The evidence therefore demonstrates that these transfers to Jackson Place were not made by KCA with the actual intent to defraud the plaintiff. The plaintiff has failed to offer any evidence that proves otherwise.[40] Accordingly, the court finds that the $53,632 in payments

---

[40] The plaintiff also cites Mr. Purdue's testimony opining that the $53,632 in transfers was fraudulent because KCA wire-transferred approximately $1.5 million to unknown payees in the months before Jackson Place loaned $150,000 to KCA. (Tr. at 337-38.) According to Mr. Perdue, these transfers may have benefitted Jackson Place. (*Id.* at 138.) A substantial portion of this $1.5 million figure constituted various wire transfers totaling $1,405,602 to unknown payees between August 27, 2002 and December 10, 2002. (Tr. at 122; Plaintiff Exhibit 29.) However, two of those wire transfers were marked as payments to the Sourcing Department, a supplier of KCA. (*Id.*) Jim Jackson testified that, based on their size, the remaining wire transfers would have also constituted payments to the Sourcing Department for product. (*Id.*) KCA also made a wire transfer of $100,010 to an AmSouth Bank account on January 13, 2003. (Tr. at 123; Plaintiff Exhibit 29.) Jim Jackson testified that KCA did hold an account with AmSouth at one time, but he did not know the specific purpose behind this wire transfer. (Tr. at 121, 123.) Apart from Mr. Jackson's testimony, there is no other evidence concerning precisely what these wire transfers constitute. Moreover, while it is conceivable that these payments may have benefitted Jackson Place, it is equally plausible that they were made for a whole host of legitimate purposes.

made by KCA to Jackson Place were not fraudulent transfers under section 66-3-305(a)(1) of the UFTA.[41]

In sum, the court concludes that none of the funds transfers made by KCA to JDD and Jackson Place totaling $131,467 were fraudulent under the UFTA. Without an underlying tortious or wrongful act, there can be no actionable claim for civil conspiracy. *Stanfill*, 2007 WL 2827498, at *7. Accordingly, the plaintiff's civil conspiracy claim must fail as it pertains to KCA's funds transfers to JDD and Jackson Place.

**B.      Jim Jackson's Transfer of JDD Shares to Angela Jackson**

The plaintiff next argues that JDD conspired with Jim and Angela Jackson to defraud him by helping create the transaction outlined in the Agreed Order. In particular, he contends that JDD acted through its employee, Kyle Jackson.[42] During the time period leading up to the entry of the Agreed Order, Kyle Jackson participated in discussions concerning the contemplated transfer of JDD stock to Angela Jackson and attempted to persuade his father to sign the Agreed Order. However, in order for JDD to have been a participant in the alleged conspiracy to defraud the plaintiff, Kyle Jackson must have acted on behalf of the agency while performing these acts. *See Trau-Med*, 71 S.W.3d at 704 (noting that the acts of corporate representatives, "if performed

----

[41] The plaintiff argues that, as was the case with its transfers to JDD, he could not verify whether KCA's transfers to Jackson Place were legitimate payments because Jim Jackson allegedly destroyed the KCA documents concerning these transfers. For the same reasons it rejected this argument with respect to JDD, the court similarly rejects the plaintiff's argument here. *See supra* note 37.

[42] At trial and in his post-trial brief, the plaintiff asserted that JDD was liable as a civil conspirator through the conduct of its employee, Kyle Jackson. (Tr. at 20, 365-66; Docket No. 208, Ex. 1 at 3, 6.)

within their representative, agency, or employment capacities on behalf of the corporation, are attributed to the corporation").

However, the evidence in the record demonstrates that Kyle Jackson was not acting on behalf of JDD when he was communicating with Jim and Angela Jackson about the stock transfer. His testimony establishes that he participated in the discussions concerning the Agreed Order in his personal capacity and outside the scope of his employment as a JDD insurance agent. Indeed, at the time of these discussions, Kyle Jackson was concerned that he might not have a job, given the agency's financial struggles. He thus testified that, "for my own purpose[,] I wanted to run the company[,] because it wasn't going to be around much longer." (Tr. at 36.) He added that "my only objective . . . was to save that company for myself and my four children. That's it." (*Id.* at 36-38.) Moreover, when asked about what he meant when he wrote in an email to his father that "now with a judgment looming[,] and per Dan[,] could come down any day[,]" Kyle Jackson testified that he made that statement because he wanted to get the stock transfer done "for [his] own selfish reasons" and that Dan Huffstutter did not, to his knowledge, advise him that a judgment could be entered against JDD any day. (*Id.* at 42.) He added that, in referring to a potential judgment, "[t]hat was probably me just trying to persuade my father to be done with my mom and the marriage and all the money he owed her and for me to take the company forward." (*Id.*)

There is also no evidence showing that Kyle Jackson was acting pursuant to any other authority, outside of his role as a JDD insurance agent, to bind the agency when he participated in discussions concerning the plan to transfer Jim Jackson's shares of stock to Angela Jackson. Indeed, the plaintiff has not shown that Kyle Jackson possessed any such authority. While it is true that, beginning in 2007, JDD's annual reports with the Tennessee Secretary of State listed

Kyle Jackson as a Vice President of the agency, he testified that the designation was meaningless and that Jim Jackson ran JDD until the entry of the Agreed Order on January 20, 2010. (Plaintiff Exhibit 7; Tr. at 33.) In his settlement with the plaintiff, Jim Jackson himself represented that he was the president and sole officer of JDD from the late-1990s until January 20, 2010. (Plaintiff Exhibit 27.) Although the annual reports also listed Kyle Jackson as a member of the Board of Directors beginning in 2007, that designation was equally meaningless, given that JDD never held Board of Directors meetings after Jim Jackson assumed sole ownership of the agency. Having found that Kyle Jackson did not act on behalf of the agency when discussing the details of the proposed Agreed Order, the court concludes that the plaintiff's civil conspiracy claim, as it pertains to the JDD stock transfer, must fail.

In reaching this conclusion, the court acknowledges that the circumstances surrounding the JDD stock transfer cast suspicion on the transaction. Among other things, Jim Jackson signed the Agreed Order and transferred all of his shares of JDD stock to his ex-wife just over two months after the plaintiff brought the present lawsuit. A little over one month after being sued, he was presented with a plan by his ex-wife's attorney to protect JDD from a potential judgment by the plaintiff that would correspondingly solve many of the issues in his divorce and hopefully preserve the agency for the benefit of his son, Kyle Jackson. Both Jim and Angela Jackson acknowledged that preserving their son's future at JDD was very important to them. At the time he learned about this plan, Jim Jackson was nearly insolvent and understood that he would be left with nothing but his farm if he signed the Agreed Order. For his part, Kyle Jackson understood that the Agreed Order was an attempt to avoid the plaintiff and any judgment he may obtain against JDD, and he communicated that understanding to his father. Jim Jackson had his own

questions concerning the impact of a potential judgment by the plaintiff against JDD and directed those inquiries to a former KCA attorney the day before he signed the Agreed Order.[43]

Yet, even if the court were to assume that the JDD stock transfer was made by Jim Jackson with the "actual intent to hinder, delay, or defraud" the plaintiff, Tenn. Code Ann. § 66-3-305(a)(1) (2004), the fact remains that Jim Jackson is no longer a defendant in this lawsuit. Moreover, the plaintiff never named Angela and Kyle Jackson as defendants. As to the actual defendant, JDD, the plaintiff has attempted to hold it liable as a civil conspirator by virtue of Kyle Jackson's employment at the agency. However, Kyle Jackson's status as a JDD employee cannot, by itself, automatically make JDD a conspirator in a scheme to defraud the plaintiff. Indeed, the plaintiff must also show that Kyle Jackson acted on behalf of the agency when he participated in discussions concerning the underlying transaction. This the plaintiff cannot do, as the evidence demonstrates that Kyle Jackson was acting in his personal capacity while discussing the plan to transfer Jim Jackson's shares of JDD stock to Angela Jackson through the Agreed Order. For these reasons, the plaintiff's civil conspiracy claim against JDD, as it pertains to the stock transfer, cannot stand.

## II.     Reverse Veil Piercing

The plaintiff seeks to hold JDD and Jackson Place accountable for the actions taken by Jim Jackson as a former shareholder of both companies. Specifically, the plaintiff argues that JDD and Jackson Place should be held liable for the following actions taken by Mr. Jackson: (1) causing KCA to transfer funds to JDD and Jackson Place; and (2) transferring JDD's shares to

---

[43] As previously noted, this attorney, Bob Harlan, did not provide a substantive response to Jim Jackson's inquiries. *See supra* note 29.

Angela Jackson pursuant to the Agreed Order. JDD and Jackson Place contend that the plaintiff's reverse piercing claim cannot succeed because it is not viable under Tennessee law.

Under Tennessee law, to pierce the corporate veil, "a court must be convinced that the separate corporate entity is a sham or a dummy or that disregarding the separate corporate entity is necessary to accomplish justice." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88-89 (Tenn. 2010) (quotation marks and citations omitted). The typical veil piercing claim involves the creditor of a corporation attempting to pierce its veil to reach the assets of the individual or individuals who control the corporation. *Nadler v. Mountain Valley Chapel Bus. Trust*, No. E2003-00848-COA-R3-CV, 2004 WL 1488544, at *4 (Tenn. Ct. App. June 30, 2004). However, sometimes creditors seek to "reverse pierce" or "'hold a corporation accountable for actions of its shareholders.'" *Id*. (quoting *Mfrs. Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866-67, n.12 (Tenn. Ct. App. 2000). The Tennessee Supreme Court has only recognized the concept of reverse piercing in the context of a parent/subsidiary relationship. *See Cont'l Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632-33 (Tenn. 1979). While the Tennessee Court of Appeals has addressed the concept of reverse piercing in the corporation/shareholder context, it has never adopted it. *Nadler*, 2004 WL 1488544, at *4; *See also Starnes Family Office, LLC v. McCullar*, 765 F.Supp.2d 1036, 1050 (W.D. Tenn. 2011) (applying Tennessee law and concluding that, "[o]utside the parent-subsidiary context, there is no authority for piercing the corporate veil in reverse."); *Hartford Fire Ins. Co. v. CMC Constr. Co.*, 2010 WL 3338581, at *24 (E.D. Tenn. Aug. 24, 2010) ("The Tennessee Court of Appeals has declined to extend the 'reverse piercing' doctrine to the corporation/shareholder context.").

The plaintiff concedes that there is no Tennessee authority for applying the doctrine of reverse piercing in the corporation/shareholder context. Instead, he attempts to argue that JDD could be held liable under a reverse piercing theory because KCA essentially functioned as a subsidiary of JDD during the first few years of its operation, when both companies shared the same office space. In support of this argument, he cites testimony from Ina Louallen's deposition, stating that she believed that Jim Jackson told her that he obtained the start-up funds for KCA from JDD. (Plaintiff Exhibit 31 at 89.) He also relies on the fact that, during this time period, KCA did not pay rent to JDD and shared an employee (Ms. Louallen) with the agency.

The plaintiff's argument is without merit. The Tennessee Code defines a subsidiary as "a corporation more than fifty percent (50%) of whose outstanding voting shares are owned by its parent and/or the parent's other wholly-owned subsidiaries." Tenn. Code Ann. § 48-11-201 (2002). However, the alleged parent here, JDD, never owned any KCA shares. Therefore, KCA was not a subsidiary of JDD, and the plaintiff's reverse piercing claim must accordingly fail.[44]

## CONCLUSION

For the reasons discussed herein, judgment will be entered for the defendants, Jackson, Denney and Davis, Inc. and Jackson Place, Inc.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[44] The defendants also argue that the plaintiff's reverse piercing claim must fail because Jim Jackson is no longer a shareholder of either JDD or Jackson Place. However, the court need not consider this argument, because even if Mr. Jackson were a shareholder, the plaintiff would nonetheless lack an actionable reverse piercing claim under Tennessee law.